UNITED STATES of America

v.

Houston H. FEASTER.

Crim. No. 15682.

United States District Court,
S. D. Alabama, S. D.

Jan. 27, 1972.

Charles S. White-Spunner, Jr., U. S. Atty., William R. Favre, Jr., Asst. U. S. Atty., Mobile, Ala., for the Government.

Thomas M. Haas, Mobile, Ala., Roland J. Mestayer, Jr., Pascagoula, Miss., for defendant.

## OPINION AND ORDER

CLARY, Senior District Judge.*

Houston H. Feaster was brought to trial on an eight count indictment charging the wilful evasion of income tax for the years 1965, 1966, 1967 and 1968. After two days of deliberation the jury returned a verdict of guilty as to Count Three only, said Count charging a violation of Title 26 U.S.C. § 7201 in the year 1966. Defendant, through counsel, has moved the Court to enter a judgment of acquittal as to Count Three, and further, in the alternative, to order a new trial of Count Three of the indictment. In this combined motion 31 specific assignments of error have been alleged and a sweeping 32nd reason reserved by the defendant in order to assign other errors as and when the transcript is prepared. The verdict was rendered on the 27th of Jan. 1972 and the defendant's motions filed February 7, 1972, yet a check with the official court reporter reveals that no transcript had been ordered as late as *April 12, 1972*. For reasons hereinafter stated, both motions will be denied.

The investigation as to income tax evasion on the part of the defendant was intertwined with a concurrent investigation of the tax liability of one Marvin Massengale, a general contractor doing business with the Alabama State Docks of which the defendant, Houston H. Feaster, was the Director. Appointed to this position by Governor George Wallace in 1963, he was successively retained in office by Governor Lurleen Wallace and Governor Brewer until his removal from office by Governor Brewer in the year 1970. The investigating Revenue Agent (not Special Agent) requested a conference with Mr. Feaster but his attorney (since deceased) informed the Agent he had advised his client not to hold such a meeting, and consequently Mr. Feaster was never interviewed. At about the same time Marvin Massengale was interviewed by a Revenue Agent, in the course of which he indicated that he had, in the years in question, 1965–1968, taken substantial cash sums from the family corporation which were unaccounted for in his personal income tax returns. The corporation's tax liability on these funds, however, had been paid in full. At the outset of that meeting the Agent inquired as to whether Massengale was paying to get contracts with the State Docks, to which Massengale replied with a vehement denial. There was no evidence indicating that anything transpired in the course of that interview which in any way implicated Houston H. Feaster. During this period of time both Massengale and Feaster were represented by the same attorney, Vincent J. Kilborne, Jr., and on his passing away, by his son Vincent J. Kilborne, III.

On or about the 27th of August 1971 in Atlanta, Georgia, Vincent J. Kilborne, III represented the tax liability interests of both Massengale and Feaster at separate, though successive, Regional Conferences with the I.R.S. Attorney Kilborne offered oral argument on the behalf of both clients and a supplemental "long, well prepared legal brief for Massengale," and further, requested that Massengale be given a Justice Department conference. The investigation of both cases was continued with preparation being made to put the information

---

* Sitting by Special Assignment.

before the Grand Jury to be convened in September in Mobile, Alabama. On or about the 15th of September 1971, Attorney Kilborne received a phone call from one of the Department of Justice attorneys then in Mobile in connection with the Massengale matter. Kilborne was informed that the situation had so developed that it was ready to go to the Grand Jury and if a Justice Department conference was still desired it would have to be on that day as the following day the case against Massengale would be presented to the Grand Jury. A conference was arranged for that evening and at the very outset of this meeting Mr. Kilborne informed the I.R.S. and Justice Department personnel present that he no longer represented Mr. Houston H. Feaster and would so inform Mr. Feaster the following morning. That fact is crucial, for in the course of the conference and in an affidavit prepared the following day, Massengale admitted that he had, over the four year period in question, been continuously paying Houston H. Feaster sums of money totalling upwards of $100,000 in order to obtain public contracts from the Alabama State Docks. Further, he provided specific check numbers and amounts which provided the money for those cash payments.

The situation changed drastically with Mr. Massengale's disclosures and while his case was not submitted to the Grand Jury, that of Houston H. Feaster was presented to the Grand Jury. The Grand Jury returned an Eight Count indictment against Mr. Feaster, charging income tax evasion for the years 1965–1968. The case was a "cause celebre" and received a great deal of publicity when the indictment was returned. The case was originally assigned to the Chief Judge of the Southern District of Alabama and a motion was filed to suppress any evidence elicited from or developed through the testimony of Marvin Massengale. The motion was carried forward to the trial of the case.

It was at this point in the proceedings that the case came to be assigned to the trial judge. As a Senior Visiting Judge the undersigned was originally scheduled during the month of January 1972, to hear a protracted antitrust case, with two satellite cases, arising out of a most involved series of transactions. In the early stages of that trial, however, the cases settled out and this case came to the undersigned for disposition. The trial of the case was begun on the 10th day of January 1972 and concluded on Thursday of the week of January 24, 1972. One day, Thursday the 13th, was spent out of the hearing of the jury in an in camera session on the Motion to Suppress and the Motion of the Government to Grant Immunity to Marvin Massengale.

In proceeding to consider the alleged trial errors asserted by the defendant this Court will not deal with them one by one, ad seriatum. Rather, the Court will treat various key portions of the trial, considering the objections attenuated thereto. The reason for proceeding in such a fashion is threefold: *first*, several of the assignments of error are repetitive and overlapping; *second*, many of them are blank indictments of the Court's conduct without any statement delineating what, if anything, made that conduct grounds for relief—thus, precise point-by-point refutation of the alleged errors is impossible, and *third*, the defendant's briefs in support of his accusations deal with broad periods of time or actions as opposed to specific instances and the Court must meet them with a presentation in kind.

On the morning the trial began the defendant made several motions, among them Motions for Continuance, a Bill of Particulars, and to Suppress Evidence from particular witnesses. The Motion to Suppress was put off for consideration at a later date, argument heard on the motion to continue and the other motions denied for failure to state sufficient grounds to justify their being granted. In seeking a continuance the defense claimed that given the vast quantity of records to be considered, the four year span of the indictment, the

fact that an Omnibus Discovery was not held, and that only three months had passed since the case's inception they required more time to prepare for trial. Further, they alleged that the delay would not hamper the government as the criminal docket had next to no backlog in the Mobile Division of the Southern District of Alabama. In reply the government noted the untimeliness of the motion—on the morning of trial when all the witnesses had been subpoenaed, that the Government had cooperated fully with the defense counsel in pretrial preparation but had received no such cooperation from the defendant, and finally, that ample time had passed for the defendant and his counsel to prepare the defense. Finally, that the request for a continuance was a sham intended only to delay and prolong trial of the case. Defense rebutted with a claim that they understood the case was not to go until the end of the term. The Court noted that the case was then approximately three months old and in view of the Government's cooperation with the defense, the period of time for preparation already passed and the added judge power then present in the district, that the case should proceed and denied the motion. The defense has presented to this Court no additional information to sway it from its earlier determination and in fact, the manner and fashion in which the defense conducted its portion of the trial reassures the Court of the correctness of that ruling.

■ In addition to the specific instances to be covered forthwith the defense alleges error on the Court's part for admitting into evidence each exhibit offered by the Government, separately and severally. In reviewing the Court's longhand notes of the case not *all* of the exhibits offered were admitted and all of those which were met the tests for admission into evidence. With the exception of certain testimony to be treated specifically later the defense counsel has set forth neither specific exhibits nor any basis for his claim as to the exhibits in evidence, separately or severally. Thus, the Court is unsympathetic to this claim and sees it as meritless.

■ The first significant aspect of the proceedings upon which the defense assigns numerous errors involves the in camera proceeding on Thursday, January 13, 1972, dealing with the defense Motion to Suppress and the Government's Motion to Grant Immunity to Marvin Massengale. The sum and substance of these objections claim that the testimony of Marvin Massengale should have been suppressed as it violated the defendant's basic Fifth and Sixth Amendment Rights. Among the specific allegations are: (1) the I.R.S. violated Feaster's right to Due Process of Law by not requiring that separate attorneys represent he and Massengale at the Regional Conference in Atlanta and thereafter, (2) that the duplicitous role of Attorney Kilborne resulted in the defendant receiving ineffective counsel at crucial pretrial stages; (3) that the unusual circumstances surrounding Massengale's Justice Department conference on the evening of September 15, 1971, indicates the Government's use of threats and coercion on Massengale in order to get the statement he gave and the resulting indictment and conviction of Feaster; (4) that Feaster had been denied Due Process because he was not given a Justice Department conference, and (5) that the Government had withheld certain documents and reports which would have been helpful to the defendant. Each of these claims were heard by the Court, evidence was accepted and testimony and argument considered before the Court reached its decision to deny the motion. Since the defendant essentially reasserts the same grounds in support of this post trial motion a single review of them will suffice.

On the matter of the I.R.S regulation forbidding one attorney to represent two taxpayers with conflicting interest: the record sets out the lack of any evidence showing knowledge by the I.R.S. that Kilborne was in violation of this rule until after he had removed himself as

counsel for Mr. Feaster. The defense refers to the Regional Conference in Atlanta but presents no facts to substantiate the allegation. Further, while the defense refers to cases that state a violation of an I.R.S. regulation can be grounds for reversal, none of those authorities require such a result as a matter of law and factually they represent an entirely different situation than one which this Court is concerned with. United States v. Heffner, 420 F.2d 809 (4th Cir. 1969); United States v. Prudden, 424 F.2d 1021 (5th Cir. 1970). The Court finds no merit in this claim and dismisses it as frivolous.

■ Defense contends that Attorney Kilborne's duplicitous role resulted in Feaster receiving ineffective counsel at crucial pretrial stages. The Court sees this claim as rather novel in so far as the only "pretrial proceeding" whatsoever was the Regional Conference in Atlanta and there is some question that said conference could be classed as a crucial pretrial stage. Nonetheless, defendant alludes to Kilborne's conduct as being against the best interest of Mr. Feaster due to his role as counsel for both Massengale and Feaster, but presents no evidence on point. Kilborne represented separate tax payers in separate conferences in what were so far as the evidence discloses, theretofore unrelated tax investigations. No further contact between the attorney and the I.R.S. occurred until the day of September 15, 1971, at which time he was acting solely in regard to Massengale (Justice Department conference) and prior to any substantive discussion on that day he announced his withdrawal as counsel for Feaster. The Court remains staunch in its earlier determination that no showing has been made to negate the effectiveness of Mr. Feaster's counsel at any time. Nor is the Court persuaded by the legal authority defendant cites in support of his position. Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 26 L. Ed.2d 387 (1970), is satisfied herein as the defendant was represented by counsel at each stage of the proceedings against him. Clearly the Justice Department conference of Marvin Massengale could in no way be considered a proceeding against Houston Feaster and consequently he had no right to have his counsel present at it. Porter v. United States, 298 F.2d 461 (5th Cir. 1962), is cited for the principle that ineffective counsel can result from a conflict of interest on the part of defendant's attorney and constitutes grounds for a reversal. With the decision in and rule of *Porter* this Court is in complete agreement—but this case is not *Porter*. *Porter* was a unique situation in which an attorney at one and the same time represented a man charged with a narcotics sale and claiming he had been framed and in a separate proceeding, an officer of the narcotics squad, charged with improper conduct and who the defendant Porter had identified to his attorney as having attempted to extort money from him under threat of arrest on bogus charges. The attorney failed to call the officer as a witness at Porter's trial, even though defendant had stated he wanted him called. There can be no doubt that the Court ruled properly in Porter, yet, in comparing the facts of *Porter* and *Feaster* it is equally obvious that there are no grounds to support such a finding in this case. Baker v. Wainwright, 422 F.2d 145 (5th Cir. 1970) and White v. United States, 396 F.2d 822 (5th Cir. 1968), are clearly inapplicable to this case, dealing with the situation where one attorney represents codefendants at the same trial. In each case he sacrificed the best interest of one in order to benefit the other. At no time was Attorney Kilborne representing both Massengale and Feaster in a single proceeding where he of necessity had to sacrifice one party's interest. There is not one scintilla of evidentiary support for defense counsel's accusation that this was the case during the *two separate* Regional Conferences held in Atlanta, Georgia. Nor does pure logic necessitate such a finding as in that case we had a separate conference for each taxpayer in theretofore unrelated tax in-

vestigations. While the principles of law espoused in these cases is clearly applicable, the application thereof requires with equal certainty an opposite ruling in this case.

■ Proceeding to the allegation that the unusual circumstances surrounding Massengale's Justice Department conference resulting in his being coerced into giving the statement incriminating Mr. Feaster—the Court listened to the testimony relating to the arrangement of and carrying out of that meeting, as well as the defendant's thorough examination of the witnesses involved. It is clearly evident that the circumstances are peculiar and the result most drastic, yet, peculiarity cannot be equated to be coercion and the serious repercussions of the meeting only point up the basis for Massengale's willingness to participate in the conference. When faced with the spectre of prosecution this Court finds no difficulty in attributing Massengale's cooperation to enlightened self-interest as opposed to Government coercion and threats. Neither has the defense provided any evidence of the contrary to be the motive nor promises of not prosecuting Massengale in return for his attending such a Justice Department conference. The Court is unmoved by this claim. The Court likewise finds no merit in the defense counsel's claim that Feaster was denied Due Process by not having a Justice Department conference. None was requested and there is no evidence that this was an improper act by Feaster's attorney. There being no violation of his rights there is no grounds for action. Finally, the Court was and remains satisfied that all *Jencks* and *Brady* materials have been turned over to the defense counsel in accord with those precepts. In conclusion, the Court remains firm in its earlier determination that the testimony and statement of Marvin Massengale, in so far as it was germane to this case, was admissable into evidence at the trial of Houston H. Feaster.

■ It is the contention of defense counsel that the Court erred in granting immunity to Marvin Massengale. The Court granted that immunity and ordered the witness to testify under the procedure set out by Title 18 U.S.C. §§ 6002–03. In light of the defense's contention that these statutory provisions were unconstitutional the Court analyzed the wording and intention of the statute and the case law on point and arrived at the conclusion that the defendant's claim was unfounded.

■ In connection with the in camera proceedings the petitioner asserts that the Bench committed reversible error by making its rulings on the Suppression and Immunity questions in open court, in the presence of the jury. Once again the Court notes the vacuum of argument and/or law in support of an alleged error. The record speaks for itself in this instance and will clearly indicate the propriety of the action of the Bench in making these rulings. Defense counsel then moving for a mistrial on the grounds the defendant had been prejudiced by the Court's conduct, the Court inquired of each member of the jury, individually, as to whether anything had transpired which would prevent them from giving the defendant a fair trial or which prejudiced them against the defendant in any way. The jury, separately and severally, replying in the negative the motion was denied and the trial continued.

The next crucial stage of the trial, in terms of the defendant's pending motions, surrounds the testimony of Mr. Charles Ditmars. In reply to the defendant's blanket accusation that the Court unduly restrained defense in its cross-examination of the witness this Court states in equally broad and far more certain terms that in the course of this trial it did not *unduly* restrain defense counsel in any way, shape or form. Further, it gave the benefit of the doubt to defendant time and time again in the course of those proceedings. The witness Ditmars being one example

of such conduct; the Government being directed to turn over not only *Brady* and *Jencks* matters but its entire file for defense use in cross-examination. Those of Mr. Ditmars' records denied the defendant were irrelevant and not germane to the issues involved in this case.

█ Chronologically, the Court's treatment of defense counsel's motion for a mistrial, due to the prejudicing of the jury by the news media, gives rise to defendant's next major source of alleged error. Following a conference in chambers, during which the defense set out the basis for its motion and the Court denied same, the Court took up the matter with the jury. The record will show that the Court, immediately after this conference, took up the matter of the news media's coverage with the jury. The jury was directed not to consider any such material, to consider only the evidence and testimony presented from the witness stand, to take the law from the Court, and to follow the early directives of the Court. The jury was polled by the Court as to whether or not they had been prejudiced by any such articles or broadcasts and whether they could still give the defendant a fair trial, based solely on the evidence. With the precautionary address having been given and the Court satisfied the defense's claim of prejudice was unfounded, the trial proceeded. This Court having earlier ruled on a defense request to suspend the local rules of court and permit interrogation of the jurors will not reconsider that issue here.

█ Undoubtedly the single most important moments of the trial in respect to the defendant's post trial motions concern the time Marvin Massengale was on the witness stand. Of the thirty-one specific allegations of reversible error, ten of them, numbers 14–23, are directly related to that time span. Several of these assignments of error being repetitive, they will be dealt with en masse. In regard to those accusations

alleging error in the Court's rulings on evidentiary questions or procedure, the answer of the Court is very brief—the record bears out the propriety and correctness of the rulings of the Bench. In the course of the direct examination of Mr. Massengale the defense counsel raised objection to nearly every question, which objections were all overruled as being improper. After a series of such objections and overrulings the Court stated that defense counsel had a continuing objection to all further questions along those lines. The Court had barely finished speaking when the defense again uttered an objection, again disrupting the Government's direct examination, and again being overruled. As the objection was repetitive and uncalled for, given the continuing objection to the whole line of questioning, and since the continuing objections not only disrupted the Government's presentation but unduly disrupted and delayed the trial, the Court requested counsel for defense to refrain from further interruptions of that nature. Counsel for defense immediately moved for a mistrial based on grounds that the Court had denied the defense the right to object to the questioning of the witness and severely prejudiced the jury against the defendant. In response the Court reiterated that the defense had a continuing objection and exception to all such questions by the Government, that further objection was pointless and would only serve to disrupt the trial, which the Court would not permit, and the defense attorney was to be seated and refrain from any further interruptions of that line of questioning. The motion for a mistrial was denied. While the exact language of these increasingly heated exchanges is unavailable (no transcript having been prepared) the sum and substance of what transpired has been portrayed. The Court merely adds that the substantive and procedural basis for these continuous objections had earlier been ruled upon by the Court, and having done so the defense's continuous objection was groundless, seemingly in-

tended as a harassment of the Government and the witness, and an unacceptable trial tactic. The Court employed utmost restraint in curtailing these actions and if any ill will toward the defendant arose out of the occasion it was due solely to the conduct and demeanor of defense counsel. This being the case, the Court reaffirms its initial determination that no reversible error was committed by the Court's having so acted in this instance.

On cross-examination of the witness Massengale the defense attempted on several instances to subvert the trial of Houston Feaster into one of Marvin Massengale. The Court time and again sustained objections to questions whose import was to do just that and also denied several defense requests for materials related to the Government's investigation of the witness Massengale. The Government having provided defense counsel all *Brady* and *Jencks* material the defense was most adamant and cautious to prevent the cross-examination of Mr. Massengale from turning into a mini-trial of a possible tax liability on the part of the witness, which was a main thrust of the defense set forth by counsel for Mr. Feaster.

 The Court having allowed the Government's large computation charts to go before the jury and admitting into evidence a facsimile of same has also been set out as error. The defense avers that the charts in and of themselves were improper, there having been no proper predicate for them. Further, that allowing them to go before the jury, and a 14″ by 8½″ facsimile to be admitted into evidence, (Government Exhibit 86) was violative of the rule of Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954). As to the first claim, that the Government had failed to lay a proper predicate for the figures represented on the charts, the Court is completely nonplused. It is incomprehensible how the assertion can be made in light of the lengthy and in depth presentation by the Government on each and every exhibit placed

in evidence, making those figures part and parcel of the record. There is no doubt in the Court's mind that the record will verify that all of the figures appearing on those charts were a matter of record before the chart was shown for the first time to the jury. Every item of income and credit was carefully presented by oral and documented testimony and when it appeared there may have been a double inclusion of the minor sum of $188 the Government immediately amended the chart to conform to the testimony. Following the admonition of *Holland* the Court was most careful, seeing to it that as soon as the testimony regarding the different items was concluded the charts were promptly (within seconds) removed from the sight of the jury and were in use only the minimum time required to explain the various items. Finally, in its charge to the jury this Court set out in clear and certain language the proper consideration to be given the charts. The charge thereby safeguarded the defendant and protected him from the dangers attenuated to the use of such charts as noted in *Holland*.

The legal authority upon which defendant relies to prove the Court's error is unconvincing, falling far short of its mark. *Holland* is clearly complied with and the Fifth Circuit case of Elder v. United States, 213 F.2d 876 (1954) was a conspiracy case, involving the use of charts solely to cumulate and repeat evidence already presented. *Elder* is clearly distinguished from the tax case *ad litem* in that the charts here, while based in part on earlier evidence, were used to compute the tax liability of the defendant, and thus a necessary adjunct to the Government's case. The use of charts of this nature in such tax cases is a long accepted and unquestionable practice in the federal courts. Lastly, Lloyd v. United States, 226 F.2d 9 (5th Cir. 1955), from which the defense quotes at length in their brief, is readily distinguishable from *Feaster* on the facts. In *Lloyd* the charts were referred to before all of the items used

in them had been introduced into the record, that was not the case in Feaster. More compelling, however, is the fact that the various headings and classifications on the charts in *Lloyd* were unquestionably slanted and created a negative inference against the accused. A review of the *Feaster* charts reveals no such abusive phrases, with the various items being described in as neutral and precise language as possible. There was no substantiation by the defense of its claim that the Court erred in allowing the facsimile to be entered into evidence—the Court asserts that none exists.

As a matter of procedure the defense moved for a directed verdict at the close of the Government's case. The evidence as to the guilt of the defendant was substantial and the Court denied the motion. The record speaks for itself. In rebuttal, the Government called Mr. McElvy to testify concerning the income tax returns for the State of Alabama of the defendant and his wife for the years 1946 through 1963. The defense has assigned as one point of error the Court's admission of those returns into evidence. The defendant having opened up those years during its presentation, alleging the defendant had made considerable amounts of money dealing in real estate, it was clearly an appropriate subject for rebuttal by the Government. However, the Government questioned the representative of the Department of Revenue of Alabama only as to real estate transactions in connection with evidence by defense witnesses that Feaster had made money in real estate during that period. The Government offered these returns and they were placed in evidence *for the record only* and were not allowed to be considered by the jury. Nor was the Government permitted to comment on any other information on those returns, as the Court felt that to do so would have been improper since the defense had not made any reference thereto. The records from 1946 to 1963 disclosed profits from the sale of stocks and real

estate of only a few hundred dollars, making the relevancy of the testimony rather apparent.

An additional miscue by the Court has been alleged to have occurred on the morning that closing arguments were begun. At the outset of that session of court Mr. Mestayer, the special tax lawyer who had been present in court and assisted trial attorney Haas throughout the trial, approached the Bench. Mr. Mestayer claimed the Government had estimated income tax liability for the years 1965 and 1966 and had done so without averaging the income. The Court is intellectually certain that this was a trial tactic on the part of counsel designed to confuse the entire case. Mr. Mestayer who was the tax counsel in the case had a Bachelor of Science in Accounting from New York University and a Master's Degree in Accounting from New York University and is a graduate lawyer who has been an outstanding tax lawyer in Mississippi for many years. This was a blatant and intentional attempt on the part of the defense to further delay and cloud the case. The very day before a two hour session was held with counsel in chambers, reviewing the points for charge, and no mention of this situation was made. The Government was only required to prove that a substantial amount had been evaded. The defendant paid $1,631.31 in federal income tax for 1966 and the defendant's own figure, arrived at through averaging was $12,-621, which differentiation the Court considered substantial. As a matter of fact, somewhere in the charge, if it is ever transcribed it will be found that the Court used the figure for the particular year which the defendant now contends should have been used—$12,-621.

The defendant's first six assignments of error all focus upon the conviction on Count No. 3 only, that it was a coerced verdict and that the acquittal as to Count No. 3 is inconsistent with that verdict and of necessity is an acquittal as to Count No. 3 as well.

The charge in Count No. 4 was substantially the same as in Count No. 3 under two different sections of the Criminal Code both charging different violations of the Code but with subtle distinction which the jury may well have regarded as twice convicting a man for the same offense.

The jury in this case, as in many others in the judicial history of the United States, has resolved the dilemma so ably stated by John H. Wigmore, the late Professor and Dean of Northwestern University School of Law, and author of "Wigmore on Evidence," that "law and justice are from time to time inevitably in conflict."

Professor Wigmore, in a scholarly article in the April 1929 issue of The Journal of The American Judicature Society, remarked that "Law and Justice are from time to time inevitably in conflict." He states that a judge as a trier of the facts may not deviate from the testimony but must follow the law of the rule which "MUST be enforced— the exact terms of the rule, justice or not justice." He continues "Now this is where the jury comes in. The jury, in the privacy of its retirement, adjusts the general rule of law to the justice of the particular case. Thus the odium of inflexible rules of law is avoided, and popular satisfaction is preserved. * * That is what jury trial does. It supplies that flexibility of legal rules which is essential to justice and popular contentment. And that flexibility could never be given by judge trial. * * * The judge must write out his opinion, declaring the law and the findings of fact. He cannot in this public record deviate one jot from those requirements. The jury, and the secrecy of the jury room, are the indispensable elements in popular justice."

The jury in this case arrived at such a compromise verdict and in the opinion of the Court for the reasons stated in the following paragraph. That the jury found it hard to return a verdict was evidenced by its second day of deliberation. The jury sent a note to the Court that it was hopelessly deadlocked. Assembling the jury, the Court asked them to try once more for another hour and a half and if at the end of that time they could not reach a verdict, a mistrial would be declared. Sitting in the court directly before the jury day by day was the defendant's wife—a lovely lady, and several, if not all, of his many children who made a great impression on the Court and I can only assume upon the jury. That the jury would find it hard to return a verdict against the father of such a family is perfectly understandable.

█ Although the record contained evidence, if credited by the jury, sufficient to substantiate a conviction on all counts, for reasons known only to the jury, it chose to acquit the defendant on seven of those counts. Yet, because the jury saw fit to so act is not a valid ground for the defense's contention that a directed verdict of acquittal was in order as per Count No. Three, of which the jury found Houston Feaster guilty. There being ample evidence in the record upon which to base such a verdict this Court finds no reason in logic or law to tamper with the jury's verdict.

If the precepts given to district court judges by the Judicial Conference of the United States and its committees as to prompt disposition of criminal cases are to have any validity, the trial of this case should be a prime example. The Court ordered disclosure of all *Jencks* and *Brady* materials. The Court also feels it exerted every effort to bring about a fair and impartial trial which the Court feels the defendant did receive. That the jury verdict was a compromise is clearly evident, but not such a compromise as transcends any rule of law or abrogates any of the defendant's rights. As Colonel Wigmore said, "The jury compromised between law and justice."

And now to wit, this 17th day of April 1972, for the reasons set forth above, it is ordered, adjudged and decreed that defendant's Motion for a Directed Verdict of Acquittal as to Count No. Three,

or, in the alternative, for a New Trial, be and it is hereby denied.

The probation officer of the Southern District of Alabama shall prepare forthwith a presentence investigation report. The defendant shall appear for sentence at a date later to be designated.