**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Houston H. FEASTER, Defendant-
Appellant.**

**No. 72–2683.**

United States Court of Appeals,
Fifth Circuit.

May 28, 1974.

Rehearing Denied Aug. 2, 1974.

Thomas M. Haas, Mobile, Ala., Champ Lyons, Jr., Montgomery, Ala., for defendant-appellant.

Charles S. White-Spunner, U. S. Atty., Irwin W. Coleman, Jr., Asst. U. S. Atty., Mobile, Ala., for plaintiff-appellee.

Before GODBOLD, SIMPSON and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Appellant Houston H. Feaster was indicted in eight counts for evading income taxes in the years 1965 through 1968. Counts 1, 3, 5 and 7 alleged that Feaster violated 26 U.S.C. § 7201[1] by

1. § 7201. *Attempt to evade or defeat tax*
 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and,

fraudulently understating his income for the years in question while Counts 2, 4, 6 and 8 alleged that he failed to report as income certain bribes and kickbacks he received during these years in violation of 26 U.S.C. § 7206(1).[2] The jury found him guilty under Count 3,[3] and we affirm that conviction.

The facts are summarized in some detail in the district court's opinion denying appellant's motion for a new trial, 341 F.Supp. 524 (S.D.Ala., 1972), and we will repeat only those necessary to gain an understanding of the principal issue raised on appeal. When the investigation of Feaster began in the fall of 1970, he was the Director of the Alabama State Docks located in Mobile. A concurrent investigation was also underway into the tax affairs of Marvin Massengale, a local Mobile contractor whose family-owned corporation did a substantial amount of work for the Docks. The investigation of Massengale revealed that between the years 1965 and 1968 he had withdrawn approximately $90,000 from the corporation. There was no indication where this money had gone other than that Massengale had not reported it on his individual return. It also developed that Feaster's life style, illustrated particularly by his bank deposits and cash expenditures, was not in line with the $15,000 a year salary he was paid as Director of the Docks. Interestingly, Massengale was asked in an initial interview with the IRS who he was "having to pay off to get work;" he replied that he did not "do that sort of thing."

Both investigations culminated in July 1971 with a recommendation to the In-

upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

2. § 7206. *Fraud and false statements*
Any person who—
(1) Declaration under penalties of perjury.—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

. . . . .

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution.
Count Two is typical of the counts which charged a violation of this statute and it reads as follows:
That on or about the 15th day of April, 1966, in the Southern District of Alabama, and within the jurisdiction of this Court, HOUSTON H. FEASTER, a resident of Mobile, Alabama, did willfully and knowingly make, subscribe and sign a false and fraudulent joint income tax return for the calendar year 1965, which was verified by a written declaration that it was made under the penalties of perjury, and was filed with the Internal Revenue Service pursuant to regulations as prescribed by said Internal Revenue Service, which said joint income tax return for the year 1965 he did not believe to be true and correct as to every material matter, in that he failed to include as taxable income bribes and kickbacks paid to the said defendant, then Director of the Alabama State Docks, as the said defendant then and there well knew.

3. Count Three involved the largest amount of unreported income covered by the indictment, and it reads as follows:
That on or about the 15th day of April, 1967, in the Southern District of Alabama, and within the jurisdiction of this Court, HOUSTON H. FEASTER, a resident of Mobile, Alabama, who during the calendar year 1966 was married, did willfully and knowingly attempt to evade and defeat a large part of the income tax due and owing by him and his wife to the United States of America for the calendar year 1966 by preparing and causing to be prepared, by signing and causing to be signed, and by mailing and causing to be mailed, in the Southern District of Alabama, a false and fraudulent joint income tax return on behalf of himself and his said wife, which was filed with the Internal Revenue Service pursuant to regulations as prescribed by said Internal Revenue Service, wherein it was stated that their taxable income for said calendar year was the sum of $9,142.31 and that the amount of tax due and owing thereon was the sum of $1,631.31, whereas, as he then and there well knew, their joint taxable income for the said calendar year was the sum of $60,893.62 upon which said taxable income there was owing to the United States of America an income tax of $15,714.53.

telligence Division of the IRS that criminal tax charges be brought against both Feaster and Massengale. The content of the report on Feaster is pertinent. In addition to listing the Massengale investigation as a related case, the report contains more than passing emphasis on the relationship between these two men. Even a casual reading leaves one with the strong impression that the agents believed Massengale's withdrawals constituted a probable source for Feaster's unreported income.

The appropriate IRS officials were apparently convinced that criminal charges were warranted because on August 27, 1971, Feaster and Massengale were afforded separate conferences in the Regional Counsel's office in Atlanta. At their respective conferences Feaster and Massengale were represented by the same attorney (hereafter Barrister), who held a power of attorney from each. From the record it appears that Feaster's conference amounted to little more than Barrister's telling the IRS that there was insufficient evidence to successfully prosecute Feaster for income tax evasion. The IRS replied that his guilt could be proven by the bank deposits and cash expenditures method.

Massengale's conference was somewhat different however. Barrister had prepared a memorandum of law which he submitted in an effort to convince the IRS to forego prosecuting his client Massengale. The thrust of the memo is that a taxpayer paying bribes or kickbacks to another on behalf of a corporation is not taxable for the monies received from the corporation to make the payments. It is in order to quote the first two paragraphs of this document:

"The following is a Memorandum of Law regarding the includability in gross income of kickbacks when received by an employee of a corporation and which kickbacks are then paid on behalf of the corporation to an employee of Federal, State or Local Government. For the purpose of this memorandum the following facts are to be assumed. The 'X' corporation was desirous of obtaining construction contracts from ABC, a governmental body. The taxpayer was an officer of 'X' corporation and made an agreement on behalf of 'X' corporation with John Dooks the Chief Executive Officer of ABC. Under the agreement, John Dooks agreed to cause 'X' corporation to receive construction contracts from ABC provided that 'X' corporation made periodic payments to John Dooks in an amount required by John Dooks. The 'X' corporation made the payments to John Dooks through the medium of the taxpayer. The taxpayer upon receipt of the payment from 'X' corporation immediately gave it to John Dooks pursuant to the agreement. The taxpayer never kept any of the payments received by him from 'X' corporation nor did he ever use any of the payments for his own benefit.

"Under the above facts the payments received by the taxpayer from 'X' corporation are not includable in his gross income under Section 61 of the Int.Rev.Code of 1954."

But the IRS told Barrister that hypothetical examples were not enough, "cold hard facts" were necessary. Barrister responded that without immunity for his client such facts would not be forthcoming. The conference ended on that note, with the IRS intending to transmit both cases to the Justice Department for presentation to the grand jury that was to be convened in Mobile on September 15, 1971.

Although Barrister requested a conference for Massengale at the Justice Department level, nothing was heard concerning this request until 6:30 P.M. on September 15, 1971. Someone from either the Justice Department or the IRS called Barrister at that time and advised him that if he desired a conference for Massengale it would have to be that very evening. Barrister then went without his client to the United States Attorney's office in Mobile and conferred with officials from the local United States Attorney's office, the Justice

Department, and the IRS regional office in Atlanta. Later that evening Barrister returned to the office with Massengale. It was not until this meeting that Barrister decided he could no longer represent Feaster, and the government officials were told that he would be informed of this development the next day.

Earnest discussions then began concerning Massengale's plight. The government evidently made it clear that unless Massengale produced facts sufficient to absolve himself of tax liability, his case would be presented to the grand jury the next day. Massengale then told his story: the money he had withdrawn from his corporation had been paid to Houston Feaster during the years in question in order to obtain construction contracts from the Alabama State Docks. His statement was reduced to writing in affidavit form the following day. Although Massengale was not given immunity at this juncture, the government agreed not to prosecute him on the basis of this statement and refrained from submitting his case to the grand jury. Feaster was thereafter indicted on September 17, 1971.

Feaster's trial began in January 1972 and lasted for a total of fourteen days. Using the bank deposits and cash expenditures method of proof, the government introduced ample evidence to create jury questions on whether Feaster had falsely understated his income for the years 1965 through 1968. As to the even numbered counts of the indictment concerning alleged bribes and kickbacks, Massengale was granted immunity and testified that he paid substantial sums to Feaster over the four years involved in order to receive favorable treatment in the awarding of construction contracts by the Docks. Feaster was found guilty only under Count 3 of knowingly and willfully signing a return which understated his income for the year 1966. *See* note 3, *supra*.

One principal issue is raised on appeal.[4] Feaster contends that Massengale's testimony should have been suppressed because the IRS violated 31 C. F.R. § 10.29 (1966), which provides as follows:

> "No attorney, certified public accountant, or enrolled agent shall represent conflicting interests in his practice before the Internal Revenue Service, except by express consent of all directly interested parties after full disclosure."

Feaster argues that the government obtained Massengale's testimony by exploiting the conflict between them at a time when both were represented by the same attorney and that the remedy for this regulation violation should be the suppression of Massengale's testimony. This is a novel request for the application of the exclusionary rule.

■ The first question is whether at some point the IRS had an obligation to tell Feaster to get another attorney, or, put another way, to inform Barrister that he could not represent both Feaster and Massengale in the proceedings which preceded the actual indictment. The government appears to argue that until the night of September 15, 1971, the IRS did not have sufficient facts available in order to make the determination that a conflict of interest existed. We must reject this assertion. From the outset of the separate investigations of Feaster and Massengale it was clear that the two cases were closely related. Even disregarding this factor, however, the thinly veiled hypothetical example submitted by Barrister at the regional conference was more than sufficient to put the IRS on notice that Massengale

4. In addition to incorporating in his appellate brief the thirty-two assertions of error relied on to support his motion for a new trial, Feaster specifically argues that the trial court unduly restricted the defense in its cross-examination of government witnesses and in its attempts to subpoena additional witnesses. He also argues that the amount of tax allegedly due by Feaster should have been reduced by income averaging. We have considered these arguments and find them to be without merit.

might be willing to put the finger on Feaster. The suggestion in the government's brief that this document "does not in any way attempt to implicate" Feaster "in any bribe or kickback arrangement with" Massengale is almost preposterous when it is considered in the light of facts known to the IRS at that time. Assuming that Barrister was in the dark concerning the extent of the IRS's knowledge, the memorandum must have removed any remaining doubt concerning the tie-in between Feaster and Massengale. The conclusion is inescapable that, at least after the regional conference, the IRS knew that Feaster and Massengale had conflicting interests. Although the conflicting interest regulation appears directed more to attorneys appearing before the IRS than to the IRS itself,[5] we are convinced that on the facts of this case the IRS had, if nothing more, an obligation to inquire into the matter to determine whether Barrister had complied with the regulation's full disclosure requirements.[6]

█ It does not follow, however, that Massengale's trial testimony should have been suppressed. There is no indication in this record that Massengale would have refrained from talking had he and Feaster been represented by different attorneys. Although damaging to Feaster, Massengale's statement was obviously in his own self-interest, and Feaster had no right to prevent him from making it. Moreover, even if Feaster had been represented by a lawyer other than Barrister, there is no basis on which this lawyer could have prevented the late night meeting detween Massengale and the government, and there is no administrative regulation which would have entitled such counsel to be present at that meeting. Massengale did not talk until he was on the verge of being indicted, and he could tell his story in an effort to avoid that event. In short, there was no evidence developed at the suppression hearing held in the trial court to support Feaster's broad allegation that Massengale's statement and subsequent testimony were achieved by governmental exploitation of the conflict of interest between the two men. Contrary to Feaster's argument, Massengale's statement and testimony did not flow from the IRS's violation of.the regulation but are a product of his desire to save himself from indictment and prosecution.

Feaster was ably represented at his trial. His present counsel presented a vigorous defense that included a thorough cross-examination of Massengale. It has not been shown that the effectiveness of this cross-examination was diminished by the fact that Feaster and Massengale were represented by the same attorney at an earlier point in time. Again, the record does not support Feaster's contention that the government obtained Massengale's testimony as a result of the failure of the IRS to strictly abide by the regulation or that Massengale's testimony somehow deprived Feaster of a fair trial.

Nor do the cases relied on by Feaster support his request for the application of the exclusionary rule to Massengale's testimony. The two most nearly in point are United States v. Heffner, 420 F.2d 809 (4th Cir., 1970), and United States v. Leahey, 434 F.2d 7 (1st Cir., 1970). Each of these cases involved the failure of an IRS special agent investigating tax fraud to give *Miranda* type warnings on initial contact with the taxpayer under investiga-

5. This regulation is found under the general heading "Duties and Restrictions Relating to Practice Before the Internal Revenue Service" and the sanction for its violation is the possibility of being disbarred or suspended from practicing before the Internal Revenue Service, 31 C.F.R. § 10.52 (1963).

6. We find little consolation from the fact that either on his own initiative or on the insistence of the government, Barrister announced that he was no longer representing Feaster immediately prior to the time Massengale made his statement. For all practical purposes, this was nothing more than a formality. It certainly did not help Feaster or serve to protect his interest in any way, and he was not informed of Barrister's withdrawal until the following day.

tion. Both courts held that incriminating statements obtained in the absence of such warnings were inadmissible in the subsequent criminal prosecutions. The courts reasoned that the IRS was bound to follow its established procedures, particularly when these procedures were specifically designed to protect a taxpayer's constitutional rights.[7] In the case at bar, however, Feaster is not attempting to suppress incriminating statements which he made, but is instead seeking to suppress incriminating statements made about him by Massengale, a third party. And as our previous discussion indicates, Massengale's statements did not flow from the violation by the IRS of the conflicting interest regulation.[8]

 Support for our conclusion that there is no basis on which to suppress Massengale's testimony is provided by the Supreme Court's recent decision in United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1973). The Court held that a grand jury witness could not refuse to answer questions on the basis that they are the product of evidence seized in an unlawful search and seizure.[9] *Calandra* presented a much stronger case for the application of the exclusionary rule than does our case, but the Court's decision explains that the rule does not necessarily apply to remedy violations of an individual's constitutional rights. The constitutional violation there was not questioned and the connection between the illegal search and the questions propounded to Calandra was established without a doubt because the materials obtained in the illegal search provided the source for the questions. But in the case at bar the relationship between Massengale's testimony and the asserted due process violation arising from the violation of the regulation is at best attenuated. The substance of Feaster's argument is that the exclusionary rule should be used here to punish the government for its questionable conduct. *Calandra* teaches that this is an inadequate reason to apply the rule. *See also* United States v. Walden, 490 F.2d 372 (4th Cir., 1974).

In conclusion, our reading of the record leaves us convinced that Feaster received a fair trial. While we do not condone the manner in which the IRS handled its aspect of the case, we have found no reason to reverse Feaster's conviction.

Affirmed.

**7.** Both courts relied, as does Feaster, on Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) and Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed. 2d 1403 (1967), as support for the proposition that the failure of a governmental agency to follow its regulations violates due process. As the *Leahey* court pointed out, however, "agencies [do not] always violate due process when they fail to adhere to their procedures." 434 F.2d at 11. It is unnecessary for us to determine whether the IRS's violation of the regulation here deprived Feaster of due process because neither of the above cases support the request to suppress Massengale's testimony.

**8.** Arguably, the situation would be different had Feaster made incriminating statements as a result of the failure of the IRS to adhere to the regulation.

**9.** The Court thus reversed the Court of Appeals for the Sixth Circuit, 465 F.2d 1218 (1972), which had affirmed the district court's holding suppressing the evidence and permitting Calandra to refuse to answer questions based on the illegally seized evidence. 332 F.Supp. 737 (N.D.Ohio, 1971).